TUTTLE and others, Respondents, vs. THE STATE and another, Appellants.

*April 4—May 8, 1951.*

**184**

For the appellants there was a brief by the *Attorney General* and *Gordon Samuelson,* assistant attorney general, attorneys, and *Maurice H. Van Susteren* of counsel, and oral argument by *Mr. Van Susteren.*

*E. Nelton* of Balsam Lake, for the respondents.

FRITZ, C. J.   Plaintiffs claim they are the owners in fee simple, as tenants in common, of said eight parcels of land (which are now islands), and they sought to prove that said islands were formerly contiguous to and a part of said lot 4, and became islands only after a rise in the lake level of Balsam lake.  On the other hand, the state of Wisconsin claims that a portion of said lot 4 belongs to the state because Balsam lake is a meandered lake and that originally said eight parcels of land were and still are islands.  In the complaint said eight parcels of land are described with metes and bounds and the total approximate area of all is twelve acres, which are vacant and unoccupied, and entirely surrounded by a bog or marsh.  It appears without dispute that in 1852 a government survey was made of said township 34 and from the field notes of the survey there was prepared a map, a copy of which was marked Exhibit 3 on the trial of the action.  It appears likewise that in 1860 a patent covering lot 4 of section 3 in said township 34 was issued by the United States to the predecessor in title of the plaintiffs.

On the trial evidence was introduced only as to the largest of the islands separated from the shore by a narrows; and

this was marked with an "X" and a circle around it on plaintiffs' Exhibit 5, which is an enlarged map made upon a survey in 1910 of only a part (including the part of section 3 in which lot 4 was located) of the larger area surveyed in 1852, as the latter appeared on the map upon said 1852 survey. Plaintiffs contended on the trial that the narrows marked "X" on Exhibit 5 was originally high land joining the islands and mainland. But defendants contended that said narrows was lake bottom, and that a portion of said government lot 4 belongs to the state because Balsam lake is a meandered lake and originally the islands were and still are islands; and defendants deny that plaintiffs ever had title to the narrows. With the exception of the field notes and map (Exhibit 3) made on the government survey of said township 34 in 1852, there is no documentary evidence in the record concerning the physical condition or status of the lands in controversy at the time of that survey. It does not show the eight parcels of land in question in this action, and that area appears as part of the lake. However, a comparison of the map (Exhibit 3) of the original survey in 1852 and the map (Exhibit 5) of the survey made in 1910 discloses that the surveyor in 1852 apparently followed the hard, dry mainland and did not include the swamp and bog within the meander line. In the survey of 1910 said original meander was retraced by the surveyor and the entire area in dispute is on the lake side of such meander line, and the original meander line retraced coincides somewhat with the present shore line excepting where the original surveyor apparently cut off a long extremely narrow neck of land curving out into the lake from said lot 4. Why the original surveyor omitted this neck of land is unknown. Within the bay or cove formed by that neck of land is a swamp or bog containing seven of the islands in dispute. The longest island in dispute is at the tip of the peninsula and separated from it by a narrows.

The 1910 survey of said lot 4 was made pursuant to the order of the council of Balsam Lake village, and the surveyor's efforts resulted in a plat marked Exhibit 5, on which there was marked on the trial of the case the circle marked "X," and the testimony then introduced was directed to the question as to whether there was water or dry land at point "X" during the years subsequent to 1905. That testimony generally was to the effect that between the parcels of land in dispute and the balance of government lot 4 there had been a considerable stand of growing tamarack, pine, and hardwood trees. Within the memory of the witnesses, these trees were all dead and the presumption was that they had been water killed. There was also testimony that between 1905 and the time of the trial in 1950, the level of Balsam lake had been raised by means of a dam or dams; and some of the witnesses fixed the rise in the water level as three feet, while others placed it at eighteen inches. That proof evidently warranted the statements in the court's written opinion to the following effect:

". . . in determining whether the lands in question were islands or not, the witnesses referred to this point [marked 'X' in the circle on Exhibit 5] and testified as to whether there was or was not water at this point on the various dates when they observed the premises. This was a narrows where if there was water, it was very shallow, and in trying the case both parties sought to prove that there was or was not water at this location. Their theory being that if there was water at this point the lands in question were islands, and if there was not water at this point engineers believe the lands were not islands and were part of lot 4."

Plaintiff Harold Tuttle, over fifty years of age, testified:

He played and hunted and fished and trapped in and around lot 4 and the point "X" when he was a boy of some ten or twelve years, and he recalled the marsh or swamp, and there was a bog in the center of the swamp and there were stumps and fallen timber there; and it was hard to cross the bog in

a boat and usually you had to go around it. The lake was to the right or east of the swamp and there was high land between the lake and the swamp; and in 1910 this point had been more often dry land than wet. The lake was lower when he was a boy. In the early days at the present outlet there were two dams instead of one.

Plaintiff Sanford Tuttle testified:

He remembers the swamp shown in Exhibit 5 and that in the early days at times there would be water at the point marked "X," but you could always walk across it. This was back in about 1905; and in the marsh there was timber four and five inches to eighteen inches to twenty inches there. It consisted of tamarack and white pine, and necessarily the timber would have to have some land, and could not grow in the middle of the lake. You could walk across the swamp, but you had to pick your spot.

Alton Ely, sixty-seven years of age, testified:

He remembered the point "X" and you could walk across this spot more times than you could not. The swamp was a high, dry swamp of tamarack, and the water is higher today than it was forty or fifty years ago, when you could walk through the point marked "X" dry-shod.

The court also stated:

The map, Exhibit 5, made by a surveyor in 1910 indicates that the point "X" was dry land. The marsh or swamp shown on that exhibit, "according to the testimony of all the witnesses, contained stumps consisting of tamarack, white pine, etc., and some of the witnesses testified that some of the tree trunks were still standing. It would seem that if this territory had been a lake stumps and trees would not be standing in it, as it is common knowledge that they do not grow in lakes. . . . It seems that if in 1900 to 1910 when there was a dam in the lake, the lake was eighteen inches to three feet lower than it is now, that unquestionably these portions of land would not be islands, but would be attached to the mainland, at the time of the government survey." According to Tuttle's testimony on the day before the trial, the depth of

the water at the point "X" was only twelve inches, "then if we go back to the time when the survey was made in 1852, when there was no dam in the lake, it would seem that there would be no question but that the lands in question were attached to lot 4 and were not islands."

And the court concluded:

Taking into consideration these facts, that the marsh or swamp contains many stumps and standing tree trunks, and that by all the witnesses it was admitted that the lake was considerably higher now than it was in 1900 to 1910, when there was a dam in the lake, and further that when the government survey was made, according to Exhibit 3 there was no dam, the court is of the opinion that the lands in question *are not islands.*

The court further found and concluded:

Plaintiffs through inheritance and a final decree acquired title to said eight parcels of land; and at the time of the government survey in 1852 said lands and all of them were attached to and were a part of lot 4 and since the time of the government survey, by reason of the raising of the water in Balsam lake, some of said lands are now separated by water at certain times of the year from the main part or body of said lot 4. Defendants and all persons claiming under the defendants subsequent to the filing of the notice of the pendency of this action are forever barred against having or claiming any right, title, or interest in said premises.

The facts thus stated in the court's opinion, findings, conclusions of law, and the judgment entered thereon were duly warranted. As almost one hundred years have elapsed since the time of the government survey in 1852, it is impossible to produce living witnesses who can testify as to the physical conditions at that time, and there seems to be scant documentary evidence available now beyond the field notes on that survey and the plat based thereon. The passage of time, however, has not destroyed all of the evidence as to conditions which existed in 1852. It is apparently common knowledge among people who have lived in the wooded areas, that living

trees may die by drowning, which is particularly true of such trees as tamarack, pine, and hardwood, the remains of which were here found present in the early part of our century, according to the testimony of witnesses in this case; and that the rampikes and dead trees did not sprout and grow under water in a lake bottom. Consequently it follows that the land which is now marsh or bog was at one time land as distinguished from lake or lake bottom. Although there can now be no surviving witnesses to testify as to just when those trees were killed by the rise of the lake level, it is a matter of common knowledge that dead trees generally do not stand erect for half a century after their death. As, according to the testimony of the witnesses on the subject, the level of the lake in 1950 was from eighteen inches to three feet higher than it was in the early 1900's, while there was in existence a dam in the lake, and as it appears from the evidence in the record that as the land around the lake was settled and developed, the lake level was raised from time to time as the need or convenience of the community or the members thereof required, the trial court understandably and rightly could find that the lands in dispute were not islands, but were a part of said government lot 4, and were the property of the plaintiffs' ancestors.

*By the Court.*—Judgment affirmed.